UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.  CASE NO.  8:13-CR-120-T-33MAP

TRESSA V. GUY, and
BRIAN E. SIMMONS

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by A. Lee Bentley, III, United States Attorney for the Middle District of Florida, hereby submits its sentencing memorandum. The United States respectfully requests that, for each defendant, the Court impose a sentence of incarceration within the Guidelines range as computed by the United States. Consideration of the advisory Guidelines range and the Section 3553(a) factors supports such a sentence as being sufficient, but not greater than necessary to serve the ends of sentencing.

I. **The Offenses**

A) **Overview**

From at least the spring of 2011 and up until their indictment on March 5, 2013, Brian Simmons and his wife, Tressa Guy, were the main figures behind a sprawling, multi-million dollar identity theft and tax fraud scheme. During this time, Simmons and Guy tried to steal millions from the government and were successful in defrauding the IRS into issuing hundreds of thousands of dollars in tax refunds in the names of identity theft victims.

How the scheme worked is a story that is unfortunately familiar to this Court. Simmons and Guy obtained stolen identities from a variety of sources, including medical patient files. They would then file fraudulent tax returns using those identities, falsifying information in order to create returns that would generate tax refunds. The refunds were deposited onto prepaid debit cards issued in the names of identity theft victims.

The prepaid debit cards had to be mailed by the card companies to physical addresses. To get the cards, the couple, but especially Simmons, would recruit others to provide addresses to be used in the scheme. Cards were mailed to these addresses, which were spread out across both Florida and Georgia. Once they retrieved the cards, Simmons and Guy would then go to ATMs and stores around both states, withdrawing their ill-gotten gains in cash.

All told, agents have identified at least 322 false returns linked to this scheme, claiming at least $2,701,844 in refunds, of which $790,421.28 was paid out. As part of her plea agreement, Tressa Guy has admitted that these figures are correct. *See* Doc. 41, ¶ 9. Simmons disputes these numbers, but the evidence will establish that he should also be held accountable for that amount. In fact, the investigation has uncovered an additional 93 tax returns for which Simmons is responsible. When these are included, the total intended loss for Simmons rises to $3,343,163, with an actual loss of $1,064,055.28.

### B) Simmons and Guy's Fraud Scheme

Simmons and Guy's scheme first came to the attention of law enforcement on a highway in Monroe County, Georgia, after a sheriff's deputy stopped the two for speeding on April 26, 2012. Simmons was driving and Guy was the only passenger. *See* Doc. 49, ¶ 9. During an ensuing search, deputies found printouts of patient information from a medical office, as well as handwritten notes that together had at least 28 names, dates of birth, and Social Security numbers, $10,818 in cash, and prepaid debit cards in the names of others. *See id.* Cell phones belonging to Guy and Simmons were also seized and revealed hundreds of text messages discussing the scheme. One of Simmons's phones had photos of an additional 33 stolen identities. *See id.*

While this was the first time anyone in law enforcement learned about what Simmons and Guy were up to, identity theft and fraud were nothing new to the couple. They had been filing false tax returns in 2012 since early January. Indeed, when Guy was later interviewed after being arrested by federal agents, she denied filing returns recently, but admitted she had filed returns in years past; Simmons admitted to filing false returns since 2011.

Despite being caught in Georgia, less than a month later, Simmons and Guy were again found in possession of prepaid debit cards in the names of identity theft victims. On May 21, 2012, the Tampa Police Department conducted a traffic stop on a car being driven by Simmons, with Guy and another individual as

passengers.  *See id.*  Thirteen debit cards were found in the car's center console; a fourteenth card was found in Guy's purse.

Being caught twice was still not lesson enough.  For example, a few months after the Tampa traffic stop, surveillance video shows Simmons, on August 16 and 17, 2012, using a debit card issued in the name of J.H., a victim of identity theft, to make cash withdrawals at ATMs and a Walmart in Tallahassee and in Tampa.  And between September and November of 2012, fifty-eight fraudulent tax returns, claiming over $400,000, were filed from an IP address registered to Simmons and Guy's residence.  *See* Exhibit 1, Chart at 13, 14.

The IRS obtained information from the Monroe County Sheriff's Office and the Tampa Police Department and was able to piece together Simmons and Guy's scheme.  By analyzing common features, the IRS was able to identify the fraudulent returns connected to the couple.  This analysis is summarized below and explained in the attached charts.  *See* Exhibit 1.  The IRS investigation also confirmed Simmons and Guy's pervasive involvement.  While not the sole figures in this conspiracy, Simmons and Guy are the main ones and they are the common thread for all the activity.

Review of the text messages from the seized cell phones also shows that Simmons was integral in obtaining addresses to use in the scheme.  Simmons would recruit individuals, offering them money in exchange for having debit cards sent to the addresses provided.  For example, one unindicted co-conspirator was M.H.  Simmons texted M.H. with an offer: "if u r interested n making a lil side

money wit me, hit me back n i'll explain." Simmons said that he was looking for "addresses outside of my area." He initially offered $200; M.H. convinced him to pay $300. At least two prepaid cards were mailed to the address M.H. provided in Bradenton, Florida. Simmons also dealt with B.W., who provided several different addresses for Simmons to use.

Simmons and Guy were ultimately indicted by a federal grand jury and arrested on April 10, 2013. When interviewed, both admitted to being involved in the scheme. Guy acknowledged, among other things, that a relative had sent her a formula for filing false tax returns (which was used on many returns linked to this scheme) and that it was her on numerous surveillance videos using debit cards in victims' names. Simmons admitted to buying lists of stolen identities from unnamed individuals, and admitted to filing returns in 2012 from various locations, including his house on Blue Magnolia Lane. He and Guy both explained that much of the money they received was spent gambling at casinos. As Simmons himself put it, he went to casinos seven days a week.

## II.   Sentencing Guidelines Computations

The Presentence Investigation Reports (PSRs) prepared by the Probation Office assigned a final offense level of 30 for both Guy and Simmons. *See* Simmons PSR ¶ 36; Guy PSR ¶ 37. Simmons has objected to the calculations for amount of loss and number of victims. The United States has made one objection: the PSR's failure to include a role enhancement for Simmons. Thus, the United

States believes the appropriate guidelines calculations for each defendant are as follows:

**Brian Simmons**
| | |
|---|---|
| Base Offense Level | 7 |
| Fraud Loss (Over $2.5 Million) | +18 |
| Number of Victims (Over 250) | +6 |
| Unauthorized Access Devices | +2 |
| Aggravating Role | +2 |
| Acceptance of Responsibility | -3 |
| Final Offense Level | 32 |

**Tressa Guy**
| | |
|---|---|
| Base Offense Level | 7 |
| Fraud Loss (Over $2.5 Million) | +18 |
| Number of Victims (Over 250) | +6 |
| Unauthorized Access Devices | +2 |
| Acceptance of Responsibility | -3 |
| Final Offense Level | 30 |

**A) Fraud Loss and Number of Victims (Objection by Simmons)**

This conspiracy involved over $2.5 million in intended loss, stemming from more than 300 fraudulent returns, each filed in the name of a different victim of identity theft. These figures come from the IRS's reconstruction of Simmons and Guy's far-flung activities. In particular, there are a series of IP addresses that were used to file fraudulent tax returns during 2012. Guy has agreed these figures are accurate, but Simmons has objected, claiming that others may have used the IP addresses and filed the returns. But each IP address can be associated with Simmons (and Guy) based on certain objective criteria, which are summarized in the charts attached as Exhibit 1. Simmons' objection also ignores his own words to

the agent—he admitted when initially interviewed that he went to multiple locations to file tax returns, consistent with the evidence outlined in the charts.

For example, 208.54.85.231 was an IP address used to file 20 fraudulent returns. Four of the victims on these returns were names that Simmons texted to co-conspirators who were providing addresses to the scheme; Simmons directed them to be on the lookout for those particular names coming in the mail.

Another IP address was 96.254.167.27, which was used to file 36 fraudulent returns. This IP address was registered in the name of Guy's daughter at what was, at the time, Simmons and Guy's residence on Blue Magnolia Lane in Brandon, Florida. Returns filed from this IP address were associated with debit cards or stolen identities found during the traffic stops. And 30 of the 36 returns use the exact formula for filing that Guy received in a text message.

These are just two examples. In total, there are nine different IP addresses whose connection to Simmons and Guy is summarized in Exhibit 1. Together, they add up to 322 fraudulent returns claiming $2,701,844 in refunds. In addition, the investigation later unearthed two additional IP addresses that Simmons should be held accountable for. These are on pages 13-15 of Exhibit 1. These additional returns push the intended loss over $3 million.

Simmons may not have personally filed each and every return in this case. But the evidence shows that all the returns being attributed to Simmons share many similar features and are part of the same conspiracy. Of course, it is well established that, in a fraud case, "a court may hold participants in a conspiracy

7

responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." *United States v. Mateos*, 623 F.3d 1350, 1370 (11th Cir. 2010) (internal quotation marks omitted). Simmons' involvement in the conspiracy was pervasive. Holding him accountable for the full scope of that conspiracy is appropriate.

### B) Producing Unauthorized Access Devices (No Objection)

An integral part of the scheme was obtaining prepaid debit cards in the names of various victims. Under § 2B1.1(b)(11), there is a 2-level enhancement if "the offense involved . . . (B) the production or trafficking of any (i) unauthorized access device." Because they unlawfully used stolen identities to cause various companies to issue debit cards in the victims' names, Simmons and Guy are subject to this enhancement. *See, e.g., United States v. Perez,* 432 Fed.Appx. 930, 935 (11th Cir. 2011) (unpublished); *United States v. Jenkins–Watts*, 574 F.3d 950, 962 (8th Cir. 2009) (upholding production enhancements).

### C) Managerial Role (Objection by United States)

The United States has objected to the PSR for Simmons on the ground that he should receive an enhancement for his managerial role in the scheme under U.S.S.G. § 3B1.1(c).[1] Text messages clearly demonstrate that Simmons recruited and directed the activities of at least two individuals who were paid to let their addresses be used in the scheme.

---

[1] There is a fair argument that the scheme involved five or more culpable participants or was otherwise extensive, but the United States is only asking for a 2-level enhancement as the evidence clearly shows that Simmons recruited and directed two others.

8

Simmons texted unindicted co-conspirator M.H. with an offer: "if u r interested n making a lil side money wit me, hit me back n i'll explain." The two bargained over how much Simmons should pay for using M.H.'s address. Simmons explained what to do, including instructing M.H. to put the victim's name on her mailbox so that the postman would deliver the cards. Similarly, Simmons got addresses from B.W., who he met through someone called "bebe." Simmons would check in with her about what had arrived and would ask if she had "completed that package 4 me [Simmons] 2 pick up." Such recruitment of co-conspirators and direction of others is within the core of the enhancement for being a manager. *See, e.g., United States v. Garrison*, 133 F.3d 831, 846 (11th Cir. 1998) (soliciting and directing other participant in Medicare scheme).

### III. Section 3553(a) Factors

Simmons and Guy tried to the loot the Treasury of millions of dollars. They succeeded in getting hundreds of thousands, which went towards things like gambling at casinos. And they were doing more than just committing fraud on the government—they were using hundreds of stolen identities, victimizing numerous people to satisfy their greed.

What Simmons and Guy did was not isolated or aberrant behavior either. Their scheme was calculated. They committed fraud day after day, month after month. They had to recruit people to use addresses, get stolen identities, get debit cards for the money, file the false returns, retrieve the cards, and go to ATMs to get the cash. This was not a brief lapse of judgment or a moment of bad behavior. It

9

was an ongoing pattern of conduct. For Simmons and Guy, fraud was their lifestyle, their work.

Not only did the scheme unfold over months, Simmons and Guy were unfazed by run-ins with law enforcement. Being caught in Georgia did not stop them. Even being caught a second time in Tampa did not stop them. This brazen disregard for the law underscores both the egregious nature of the offenses here and the character of the defendants. It also shows that a stiff sentence is needed for specific deterrence.

Disregard for the law is also nothing new to Simmons in particular. He is essentially a career criminal. Since 1992, when he was only 11, hardly a year has gone by where Simmons has not been convicted of some crime—and those rare years without a new entry in his ever-increasing criminal history are generally times when he was in prison. *See generally* Simmons PSR ¶¶ 40-78. In total, Simmons has 24 criminal history points—almost twice the number to be in criminal history category VI.

General deterrence is also an important factor to consider. Many areas across the country are facing an epidemic in the crimes seen in this case, but few places more so than Tampa, which only increases the importance of sending a message here. *See, e.g., United States v. Landry*, 631 F.3d 597, 607-08 (1st Cir. 2011) (holding that district court did not err in considering the growth of identity theft crimes and the resulting need for deterrence in imposing a sentence).

## IV.     Conclusion

Ultimately, both the Guidelines and the sentencing factors laid out in § 3553(a) point to the same place: for their long-running and significant fraud, Simmons and Guy deserve substantial sentences.

          Respectfully submitted,

          A. LEE BENTLEY, III
          United States Attorney

By:    *s/ Jason Poole*
        Jason Poole
        Trial Attorney
        USAO No. 179
        Department of Justice, Tax Division
        Southern Criminal Enforcement Section
        601 D Street NW
        Washington, DC 20579
        Telephone:   (202) 514-0302
        Facsimile:    (202) 514-0961
        Email:         jason.h.poole@usdoj.gov

        *s/ Matthew J. Mueller*
        Matthew J. Mueller
        Assistant United States Attorney
        Florida Bar No. 0047366
        400 N. Tampa Street, Suite 3200
        Tampa, Florida 33602-4798
        Telephone:   (813) 274-6000
        Facsimile:    (813) 274-6103
        E-mail:         matthew.mueller@usdoj.gov

**U.S. v. Tressa Guy, et al**                               **Case No. 8:13-CR-120-T-33MAP**

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2014, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

    Howard Anderson
    Grady Irvin, Jr.

                                            *s/ Matthew J. Mueller*
                                            Matthew J. Mueller
                                            Assistant United States Attorney
                                            Florida Bar No. 0047366
                                            400 N. Tampa Street, Suite 3200
                                            Tampa, Florida 33602-4798
                                            Telephone:   (813) 274-6000
                                            Facsimile:    (813) 274-6103
                                            E-mail:          matthew.mueller@usdoj.gov